TREG TAYLOR
ATTORNEY GENERAL

Ronald W. Opsahl (Bar No. 2108081)
Assistant Attorney General
Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Fax: (907) 276-3697
Email: ron.opsahl@alaska.gov

Kathleen C. Schroder (*pro hac vice* pending)
Mark E. Champoux (*pro hac vice* pending)
Davis Graham & Stubbs LLP
3400 Walnut Street, Suite 700
Denver, CO 80205
Telephone: (303) 892-9400
Fax: (303) 893-1379
Email: katie.schroder@davisgraham.com
        mark.champoux@davisgraham.com

*Attorneys for the State of Alaska*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA, ) | Case No. 3:25-cv-00003 |
| ) | |
| Plaintiff, ) | **COMPLAINT** |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| THE INTERIOR, DEB HAALAND, in ) | |
| her official capacity as Secretary of the ) | |
| Department of the Interior, LAURA ) | |
| DANIEL-DAVIS, in her official ) | |
| capacity as Acting Deputy Secretary, ) | |
| BUREAU OF LAND ) | |
| MANAGEMENT, TRACY STONE- ) | |
| MANNING, in her official capacity as ) | |
| Director of the Bureau of Land ) | |
| Management, and STEVEN M. COHN, ) | |
| in his official capacity as State Director ) | |
| of the Bureau of Land Management ) | |
| Alaska Office, ) | |
| ) | |
| Defendants. ) | |

Complaint,
*State of Alaska et al. v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

## INTRODUCTION

1. This lawsuit challenges the United States' administrative actions in 2024 that violate Congress' statutory mandate that the Coastal Plain area of the Arctic National Wildlife Refuge (the "Refuge") be opened to oil and gas leasing and development.

2. Although most of the Refuge is designated as wilderness, in 1980 Congress expressly set aside the 1.5 million-acre Coastal Plain area for potential oil and gas development subject to further study.

3. Many years after such study had been completed, in 2017, Congress instructed that the time had finally come to develop the mineral resources of the Coastal Plain. Specifically, Congress directed the Secretary of the Interior ("Secretary") to develop and administer an oil and gas leasing and development program on the Coastal Plain. Central to Congress' mandate was the requirement that the Secretary conduct at least two sales of oil and gas leases. Each sale was to offer at least 400,000 mineral acres for lease. The first sale was to occur by December 2020, and the second sale was to occur by December 2024.

4. To implement Congress' direction, the Bureau of Land Management ("BLM") spent several years undertaking a thorough and thoughtful environmental review that balanced oil and gas leasing and development with protection of the Refuge's sensitive resources. Finally, in 2020, the BLM held its first lease sale for the Coastal Plain and sold eleven oil and gas leases.

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

5.      In 2021, although Congress did not give any new or different direction, a new presidential administration decided to chart a different course. The incoming presidential administration nullified the oil and gas lease sale first by suspending the previously-issued leases and then by cancelling them entirely. The administration then initiated a new environmental review process to second-guess the existing oil and gas leasing decisions. Although Plaintiff State of Alaska ("the State") was designated as a cooperating party to this environmental review, the State and other cooperators were afforded little visibility into the BLM's seemingly predetermined decision-making process.

6.      In December 2024, Defendants United States Department of the Interior ("DOI") and BLM unveiled a decision that negates Congress' express call for oil and gas leasing and development on the Coastal Plain. The decision authorized DOI to lease but essentially rendered the lands to be leased undevelopable by severely limiting use and occupancy of their surface. Then, to ensure that no future lease sales could occur, the DOI closed nearly 1.2 million acres of the Coastal Plain to oil and gas leasing.

7.      The United States' conduct both thwarted Congress' express purpose of having actual oil and gas development occur within the Coastal Plain and also violated numerous specific requirements of the 2017 statutory mandate.

8.      In addition, to achieve this predetermined result, the United States' new environmental review violated the requirements of the National Environmental Policy Act ("NEPA"). Among other things, the United States' 2024 decision on development (that has

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

the effect of deterring and impeding development) of oil and gas in the Coastal Plain was never presented to the public for comment and, in fact, is significantly different than any of the proposed alternative decisions that were presented for public comment. The environmental review and subsequent decision were also premised on a legally incorrect interpretation of the statutory purposes of the Refuge's establishment, which essentially negated Congress' express direction that a primary purpose of the Refuge was to provide for an oil and gas program on the Coastal Plain.

9.     The United States' conduct harms the State by depriving it of significant revenue that was to be generated directly from oil and gas leasing and development of the Coastal Plain and otherwise depriving the State and its citizens of the broader economic benefits that would result from such development.

10.     After years of deliberation and study of the potential benefits, costs, and risks, Congress mandated a policy of developing oil and gas on Alaska's Coastal Plain and established specific requirements to do so. The 2024 actions by the DOI and the BLM violate these specific requirements and frustrate Congress' overall purposes. As such, they must be set aside as contrary to law.

## PARTIES

11.     Plaintiff State of Alaska is a sovereign state, with an interest in royalty payments and other potential revenues derived from oil and gas production on the Coastal

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

Case 3:25-cv-00003     Document 1     Filed 01/06/25     Page 4 of 42

Plain and an interest in the economic opportunities that oil and natural gas development provides for Alaska's citizens.

12.     Defendant DOI is an agency within the executive branch of the United States government responsible for oversight of the BLM.

13.     Defendant Deb Haaland is the Secretary of the Interior. She is sued in her official capacity.

14.     Defendant Laura Daniel-Davis is the Acting Deputy Secretary. She is sued in her official capacity.

15.     Defendant BLM is agency within the DOI with responsibility for managing federal public lands.

16.     Defendant Tracy Stone-Manning is the Director of the BLM, within the DOI. She is sued in her official capacity.

17.     Defendant Steven Cohn is the State Director of the Alaska office of the BLM. He is sued in his official capacity.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this case because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§ 1331, 2201; 5 U.S.C. §§ 701–706.

19.     This Court has jurisdiction over this action because the judicial review provisions of the Administrative Procedure Act ("APA") waive the sovereign immunity of

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

the federal government and provide a right of judicial review for persons suffering a legal wrong because of agency action or who are adversely affected or aggrieved by agency action within the meaning of a relevant statute. 5 U.S.C. § 702.

20.     This Court also has jurisdiction over this action because the APA provides a right of judicial review for final agency action for which there is no other adequate remedy. *Id.* § 704.

21.     This Court also has jurisdiction over this action because the APA authorizes this Court to decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action, and to hold unlawful and set aside agency action that is not in accordance with law or is in excess of statutory jurisdiction. *Id.* § 706.

22.     Venue is proper in this District because Defendants are United States agencies or officers sued in their official capacities and a substantial part of the events or omissions giving rise to the Complaint occurred within this District. *See* 28 U.S.C. § 1391(e)(1).

<u>**FACTUAL BACKGROUND**</u>

**I.      CONGRESS AUTHORIZES OIL AND GAS LEASING ON THE COASTAL PLAIN.**

**A.      Congress Recognizes the Coastal Plain's Oil and Gas Resources.**

23.     The Coastal Plain, also known as the "Section 1002 Area," contains one of the largest untapped reserves of oil and gas in the world, with billions of barrels of

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

recoverable oil below its surface. Mean estimates for the Coastal Plain suggest it contains approximately 7.687 billion barrels of technically recoverable oil. *See* Final Coastal Plain Oil and Gas Leasing Program EIS at ES-4 (2019) (hereinafter "2019 Final EIS"). The U.S. Energy Information Administration has estimated that approximately 3.4 billion barrels of oil could be produced from the Coastal Plain by 2050. *Id.*

24. The Coastal Plain is located within the Refuge. Originally established in 1960 as the Arctic National Wildlife Range, in 1980 Congress expanded and redesignated the Range as the Refuge through the Alaska National Interest Lands Conservation Act, Pub. L. No. 96-487, 94 Stat. 2371 (1980) ("ANILCA").

25. In ANILCA, Congress identified four purposes for which the Refuge was established and would be managed, which included: (a) "to conserve fish and wildlife populations . . . "; (b) "to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats"; (c) "to provide . . . the opportunity for continued subsistence uses by local residents"; and (d) "to ensure . . . water quality and necessary water quantity within the refuge." ANILCA § 303(2)(B).

26. Additionally, through ANILCA, Congress designated much of the Refuge as wilderness, withdrawing that land from potential oil and gas development. *Id.* § 702(3); *see generally* 16 U.S.C. § 1133(d)(3).

27. Congress, however, recognized the potential of the Coastal Plain's oil and gas resources. Congress expressly excluded this 1.56 million-acre area on Alaska's

Case 3:25-cv-00003     Document 1     Filed 01/06/25     Page 7 of 42

northern coast from the wilderness designation, as that area had the greatest potential for hydrocarbon development. *See* ANILCA § 1002 (codified at 16 U.S.C. § 3142); *see also* 163 Cong. Rec. S8101 (daily ed. Dec. 19, 2017) (statement of Sen. Lisa Murkowski) ("[T]he 1002 [Area] was never in wilderness [and] is not in wilderness.").

28.     Congress then directed the study of the Coastal Plain's resources and preparation of a report by the Secretary regarding "further exploration for, and the development and production of, oil and gas within the coastal plain." ANILCA § 1002(h)(6) (codified at 16 U.S.C. § 3142(h)(6)). In the meantime, however, Congress temporarily prohibited the leasing, development, or production of oil and gas from the Refuge. *Id.* § 1003 (codified at 16 U.S.C. § 3143).

29.     The DOI completed its report in 1987, recommending energy development and that Congress enact legislation to authorize the DOI to conduct "an orderly oil and gas leasing program for the entire 1.5-million-acre 1002 area." *See* DOI, Fish and Wildlife Service, Geological Survey, and BLM, Arctic National Wildlife Refuge, Alaska, Coastal Plain Resource Assessment, Report and Recommendation to the Congress of the United States and Final Legislative Environmental Impact Statement (1987).

30.     Despite the DOI's 1987 report, oil and gas leasing remained prohibited on the Coastal Plain until Congress took further action. *See* ANILCA § 1003 (codified at 16 U.S.C. § 3143).

**B.** **Congress Authorizes Oil and Gas Development on the Coastal Plain in 2017.**

31. Thirty years after the DOI's 1987 report, Congress lifted ANILCA's oil and gas leasing prohibition and expressly opened the Coastal Plain for oil and gas leasing and development in 2017. This legislation was part of the Tax Cuts and Jobs Act of 2017, Public Law 115-97 ("Tax Act"), which was signed into law on December 22, 2017.

32. The Tax Act specifically directs that "[t]he Secretary shall establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain." Tax Act § 20001(b)(2)(A). The Tax Act further directs that "the Secretary shall manage the oil and gas program on the Coastal Plain in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. 6501 et seq.) (including regulations)." *Id.* § 20001(b)(3).

33. The Tax Act also expressly repealed ANILCA's temporary prohibition of oil and gas development on the Coastal Plain. *See* Tax Act § 20001(b)(1) ("Section 1003 of [ANILCA] shall not apply to the Coastal Plain."). Additionally, the Tax Act amended Section 303 of ANILCA to add a fifth purpose of the Refuge's establishment: "to provide for an oil and gas program on the Coastal Plain." *Id.* § 20001(b)(2)(B)(iii).

34. To ensure prompt leasing of the Coastal Plain, Congress established a schedule for lease sales in the Tax Act. Congress required the Secretary of the Interior to conduct "not fewer than 2 lease sales area-wide" on the Coastal Plain within 10 years after

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

the Tax Act's passage. *Id.* § 20001(c)(1)(A). Congress required the first lease sale to occur no later than December 22, 2021, and the second sale to occur no later than December 22, 2024. *Id.* § 20001(c)(1)(B)(ii).

35.    Congress also sought to ensure that lease sales would meaningfully promote oil and gas development on the Coastal Plain. Thus, Congress directed that, at each lease sale, the Secretary offer at least 400,000 acres "area-wide" for lease. *Id.* § 20001(c)(1)(B)(i)(I). Similarly, Congress required the Secretary to offer for lease "those areas that have the highest potential for the discovery of hydrocarbons." *Id.* § 20001(c)(1)(B)(i)(II).

36.    Congress' direction to ensure that oil and gas leasing and development occur on the Coastal Plain went beyond just the requirement of lease sales. For example, to facilitate oil and gas exploration and development on the Coastal Plain, the Tax Act directs that the Secretary "shall issue any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out this section." *Id.* § 20001(c)(2).

37.    The Tax Act provides that the State of Alaska share in the revenue generated by oil and gas leasing and development on the Coastal Plain. The Act establishes a 16.67 percent royalty rate for leases within the Coastal Plain and entitles the State to receive fifty percent of all bonus, rental, and royalty receipts derived from the Coastal Plain leases. *Id.* § 20001(b)(4), (b)(5)(A). Based on these sources of potential revenue, the Congressional

Case 3:25-cv-00003    Document 1    Filed 01/06/25    Page 10 of 42

Budget Office estimated that the State would receive $1.1 billion in direct lease-related revenues between 2018 and 2027. *See* Cong. Budget Office, *Cost Estimate, Reconciliation Recommendations of the Senate Committee on Energy and Natural Resources* at 3 (Nov. 21, 2017).

38.     In the Tax Act, Congress also balanced the Coastal Plain's sensitive resources with the revenue-generating purposes of the Tax Act. Congress directed that the Secretary "shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any area covered by gravel berms or piers for support of pipelines) during the term of the leases under the oil and gas program[.]" Tax Act § 20001(c)(3).

## II.     IN 2021, THE BLM OFFERS LEASES ON THE COASTAL PLAIN.

39.     Following the enactment of the Tax Act and pursuant to Congress' mandate, the DOI, through the BLM, spent years and nearly $4 million conducting environmental reviews of the Coastal Plain oil and gas leasing program pursuant to NEPA.

40.     In 2018 and 2019, the BLM prepared draft and final environmental impact statements ("EISs") analyzing alternatives for, and potential environmental impacts of, leasing on the Coastal Plain. *See* 83 Fed. Reg. 67337 (Dec. 28, 2018); 84 Fed. Reg. 50472 (Sept. 25, 2019).

41.     In accordance with 40 C.F.R. § 1502.13 (2019), the BLM defined the EIS's purpose and need to include the establishment and administration of a competitive oil and

Case 3:25-cv-00003     Document 1     Filed 01/06/25     Page 11 of 42

gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain as required by the Tax Act. The purpose and need statement did not reference the Refuge's statutory purposes. *See* 2019 Final EIS at 1-1 to 1-2.

42.     On August 17, 2020, the Secretary issued a Record of Decision ("2020 ROD") establishing a carefully crafted oil and gas development plan within the Coastal Plain.

43.     The 2020 ROD made all approximately 1,563,500 acres of federally owned minerals within the Coastal Plain program area available for oil and gas leasing. The program area includes all lands within the Coastal Plain for which the federal government owns the mineral interest, with the exception of Air Force-administered lands near Kaktovik and approximately 4,400 acres of federal lands selected for conveyance under the Alaska Native Claims Settlement Act. 2020 ROD at 4. In the 2020 ROD, the BLM explained that, "given the limited geophysical information that currently exists for the Coastal Plain, making the entire program area available for leasing ensures that the areas having the highest potential for the discovery of oil and gas can be prioritized for offering in the first two lease sales," as required by the Tax Act. *Id.* at 17.

44.     The 2020 ROD balanced the protection of lands that have significant surface values with Congress' intent for exploration and development of the Coastal Plain. Of the 1.5 million mineral acres available for oil and gas leasing, the surface of approximately 359,400

acres was subject to No Surface Occupancy ("NSO") stipulations and the surface of approximately 721,200 acres was subject to operational timing limitations. *Id.* at 3.



**Figure 1 – Leasing Availability and Terms Pursuant to the 2020 ROD**

45.     The 2020 ROD also interpreted the Tax Act's directive that the Secretary "shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities." *See* Tax Act § 20001(c)(3). The 2020 ROD explained that "the 'shall authorize' language in (c)(3) functions as a directive to the BLM that it must not deny or unreasonably limit development of production and support facilities on the Coastal Plain until 2,000 surface acres are covered by production and support facilities." 2020 ROD at 10.

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

46.     On December 7, 2020, the BLM published a notice of competitive sale for oil and gas leases on the Coastal Plain. On December 18, 2020, the BLM published an amended detailed statement of sale, which removed certain tracts and acreage. In the end, the BLM offered twenty-two tracts covering 1,089,053 acres for lease.

47.     The BLM accepted bids between December 21, 2020, and December 31, 2020, and conducted the first Coastal Plain lease sale on January 6, 2021 ("2021 Lease Sale"). Three entities were awarded leases on eleven tracts covering 552,802 acres: Tracts Nos. 16, 17, 22, 23, 24, 25, 26, 27, 29, 30, and 31.



**Figure 2 – Coastal Plain 2021 Lease Sale (leased tracts highlighted)**

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

48.     The Alaska Industrial Development and Export Authority ("AIDEA") secured leases for nine tracts underlying 365,755 mineral acres: Nos. 16, 17, 22, 23, 24, 26, 27, 30, and 31. Knik Arm Services LLC ("Knik Arm") and Regenerate Alaska, Inc. ("Regenerate Alaska"), purchased leases for tracts Nos. 25 and 29, respectively.

49.     Based on the leases sold, the State of Alaska was entitled to fifty percent of the bonuses totaling about $8.4 million and fifty percent of the first-year rentals, totaling approximately $3.1 million. In total, the State of Alaska was entitled to receive $11.5 million in revenue from the initial sale of the 2021 Coastal Plain leases.

## III.     PRESIDENT BIDEN CANCELS LEASES ON THE COASTAL PLAIN AND STARTS OVER WITH A NEW LEASING PROCESS.

### A.     After a Change of Presidential Administration, the BLM Reverses Course and Prepares a Supplemental Environmental Impact Statement.

50.     Within hours of taking office on January 20, 2021, President Joseph R. Biden, Jr. issued Executive Order 13990 (the "Executive Order"). Section 4(a) of the Executive Order directed the Secretary to "place a temporary moratorium on all activities" related to the implementation of the oil and gas leasing program. The Executive Order also directed the Secretary to review the leasing program and "conduct a new, comprehensive analysis" of the potential environmental impacts, requiring, in essence, a Supplemental Environmental Impact Statement ("SEIS").

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

51.     In June 2021, the Secretary issued Secretarial Order No. 3401 (the "Secretarial Order"), which purported to temporarily halt "all [a]ctivities in the Arctic National Wildlife Refuge Relating to the Coastal Plain Oil and Gas Leasing Program."

52.     The Secretarial Order states that the Secretary:

> has identified multiple legal deficiencies in the underlying record supporting the leases, including, but not limited to: (1) insufficient analysis under [NEPA], including failure to adequately analyze a reasonable range of alternatives in the [EIS]; and (2) failure in the August 17, 2020, Record of Decision (ROD) to properly interpret Section 20001 of Public Law 115-97 (Tax Act).

Secretarial Order at § 3.

53.     The Secretarial Order provides no further elaboration on the alleged shortcomings of the alternatives analysis or on the nature of the allegedly improper interpretation of Section 20001.

54.     On August 4, 2021, the BLM published a Notice of Intent to prepare a SEIS for the Coastal Plain leasing program. 86 Fed. Reg. 41989 (Aug. 4, 2021).

**B.    The State Assumes the Role of a Cooperating Agency in the Process to Develop the SEIS.**

55.     The State and the BLM agreed that the State would be a cooperating agency during the process to develop the SEIS, as authorized by 40 C.F.R. § 1501.8(a). In February and March 2022, the State and the BLM respectively executed Memorandum of Understanding No. BLM-MOU-AK-2022-003 ("MOU") that established and

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

memorialized clear roles for the BLM, the U.S. Fish and Wildlife Service ("FWS"), and the State.

56. In the MOU, the BLM agreed that it would "engage in open and timely communications regarding development of the SEIS." MOU at 2.

57. The BLM also agreed that it and the FWS "shall provide the [State] copies of the preliminary alternatives, preliminary Draft SEIS, preliminary Final SEIS, and other preliminary documents[.]" *Id.*

58. In the MOU, the BLM further agreed that it and the FWS "shall also meet with the [State] to discuss the comments submitted during cooperating agency and public reviews and provide the [State] with written responses to the comments, including identifying any resulting changes to the SEIS and related documents." *Id.*

59. Despite the commitments in the MOU, the BLM did not provide the State with the preliminary alternatives analyzed in the SEIS before the BLM distributed a copy of the Preliminary Draft SEIS to all cooperators.

60. On June 2, 2023, the BLM and the FWS provided a Preliminary Draft SEIS to cooperators, including the State. The BLM and the FWS required comments on the Draft SEIS only ten business days later, on June 16, 2023.

**C.    The BLM Cancels the Coastal Plain Leases.**

61. On September 6, 2023, the Deputy Secretary of the Interior unilaterally cancelled AIDEA's leases.

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

62. Previously, on April 28, 2022, and August 16, 2022, Regenerate Alaska and Knik Arm, respectively, had entered into agreements with the United States to cancel their leases.

**D. With a Purportedly Clean Slate, the BLM Devises a Plan Behind Closed Doors to Constrain Leasing and Development of the Coastal Plain.**

63. At the same time it cancelled AIDEA's leases, the BLM issued a Draft Coastal Plain Oil and Gas Leasing Program Supplemental Environmental Impact Statement ("Draft SEIS"). 88 Fed. Reg. 62104 (Sept. 8, 2023). The Draft SEIS proposed a dramatically different approach to management of the Coastal Plain.

64. Among other things, the Draft SEIS altered the purpose and need statement that had appeared in the 2019 Final EIS. The Draft SEIS required that management of the Coastal Plain must fulfill all purposes of the Refuge by adding a statement that "[a]ny oil and gas program alternative must consider *all five* statutory purposes of the [Refuge], *none of which are superseded by any other*[.]" Draft SEIS at 1-3 (emphasis added).

65. Furthermore, the Draft SEIS set forth the BLM's new interpretation of the 2,000-acre provision in Section 20001(c)(3) of the Tax Act. The BLM explained that 2,000 is "the total number of surface acres of *all* federal land across the Coastal Plain, regardless of whether such land is leased, which may be covered by production and support facilities." Draft SEIS at 1-9 (emphasis in original). Relatedly, the Draft SEIS asserted that off-lease

pipelines or roads authorized by right-of-way grants count towards the perceived 2,000 acre limit but that reclaimed acreage would not. *Id.* at 1-9 – 1-10.

66.     The Draft SEIS also proposed a new alternative decision (Alternative D), in addition to the two alternatives analyzed in the 2019 Final EIS (Alternatives B and C) and the no action alternative (Alternative A). *See* 40 C.F.R. § 1502.14(c).

67.     Alternative D would close more than half the program area (797,700 acres) to leasing, leaving only 765,800 acres available for leasing. *See* Draft SEIS at 2-2 tbl.2-1, 3-72 tbl.3-22. Furthermore, Alternative D would impose NSO stipulations on nearly all lands available for lease (726,300 acres) and controlled surface use stipulations on 15,900 acres. *Id.* at 2-2 tbl.2-1.

68.     Alternative B would offer the opportunity to lease the entire 1.5 million-acre program area with the fewest acres subject to NSO stipulations (358,100 acres) and no acres subject to controlled surface use stipulations. *Id.* Alternative C would offer the opportunity to lease approximately two-thirds of the program area (1,037,200 acres) and would close 526,300 acres to leasing. *Id.* at 2-2 tbl.2-1, 3-71 tbl.3-21. On lands available for lease, Alternative C would impose NSO stipulations on 708,200 acres and controlled surface use stipulations on 123,900 acres. *Id.* at 2-2 tbl.2-1.

69.     The BLM and the FWS offered a 45-day notice and public comment period on the Draft SEIS and extended this period by an additional 15 days. The State submitted

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

public comments on the Draft SEIS, objecting to Alternative D and the revised purpose and need statement, and identifying other concerns.

70.     After the public comment period on the Draft SEIS closed, the BLM and the FWS never met, nor offered to meet, with the State as a cooperating agency.

71.     In a May 3, 2024, email, the BLM advised the State that the BLM would not provide cooperators with a Preliminary Final SEIS for their review before the BLM published the Final SEIS. The BLM explained that it had "refin[ed] the lease stipulations and required operating procedures across the range of alternatives." The BLM did not reveal that it had developed a new alternative that was not included in the Draft SEIS.

72.     On November 8, 2024, the BLM published its Final SEIS for the Coastal Plain Leasing Program ("Final SEIS"). 89 Fed. Reg. 88805 (Nov. 8, 2024).

73.     The Final SEIS introduced a new alternative that was not considered in the Draft SEIS or the 2019 Final EIS and thus never subject to public comment. This new alternative, known as "Alternative D2," proposed more limits on leasing than any of the alternatives proposed in the Draft SEIS. Specifically, Alternative D2 proposed to close 1,1653,500 mineral acres of the program area to leasing, leaving only approximately 400,000 mineral acres to open leasing. Final SEIS at 2-2 tbl.2-1. Then, in the limited area available for leasing, Alternative D2 proposed to either prohibit or severely constrain surface use. The surface of fifty-eight percent (231,700 acres) of the area available for leasing would be subject to NSO stipulations that prohibit "the construction of surface oil

and gas facilities in order to protect other resource values." *Id.* at 2-2 tbl.2-1, Glossary-14. Additionally, the surface of twenty-one percent (84,300 acres) of the area available for leasing would be subject to controlled surface use stipulations, which allow only "some use and occupancy of public lands, while protecting identified resources or values." *Id.* at 2-2 tbl.2-1, Glossary-5. The surface of another 3,100 acres of the area available for leasing would be subject to timing limitations, which close areas "to fluid mineral exploration and development, surface-disturbing activities, and intensive human activity during identified time frames." *Id.* at 2-2 tbl.2-1, Glossary-21.

74.     In the Final SEIS, the BLM selected its new Alternative D2 as its "preferred alternative," *id.* at 2-5, describing it as "the most restrictive of all action alternatives." *Id.* at 3-10, 3-29.

75.     The Final SEIS also adopted newfound legal conclusions. It modified the BLM's interpretation of the 2,000-acre provision in Section 20001(c)(3) of the Tax Act from the interpretation set forth in the Draft SEIS. The BLM disregarded its prior conclusion that reclaimed acreage would not count toward the limit, 2019 Final EIS at 1-7, stating that "[o]nce 2,000 acres of disturbance are reached, no additional disturbance would be allowed, regardless of reclamation of previously disturbed areas." Final SEIS at 1-9 to 1-10.

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

76.     Additionally, the Final SEIS retained the purpose and need statement set forth in the Draft SEIS, which required the alternatives to consider "all five statutory purposes" of the Refuge, "none of which are superseded by any other." *Id.* at 1-3.

### E.     The BLM Issues a New Record of Decision that Drastically Reduces and Diminishes Areas Available for Leasing and Development.

77.     On December 8, 2024, the DOI signed a new Record of Decision ("2024 ROD"). 89 Fed. Reg. 101042 (Dec. 13, 2024). The 2024 ROD dramatically reduces and restricts leasing and future development of the 1.56-million-acre Coastal Plain.

78.     The 2024 ROD adopts Alternative D2 from the Final SEIS, which the BLM had first noticed to the public only 30 days earlier. 2024 ROD at 2. As a result, the 2024 ROD makes only approximately 400,000 acres available for leasing within the entire Coastal Plain and closes 1,163,500 acres to any oil and gas leasing or exploration, as reflected on Figure 3, below. *Id.* at 7 Map 2. The 2024 ROD describes the 400,000 acres available for leasing as "the statutory minimum" and "the lands with highest hydrocarbon potential" within the Coastal Plain. *Id.* at 5. The 2024 ROD only allows seismic exploration activities in areas available for leasing. *Id.* at 12-13.

79.     The 2024 ROD also adopts the stringent NSO, controlled surface use, and timing limitation stipulations across nearly all of the Coastal Plain that were proposed under Alternative D2, as reflected in Figure 3 below. *Id.* at 5.

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003



**Figure 3 – 2024 ROD Constraints**

80.     As a result of these NSO and other stipulations, the BLM estimated that the total surface disturbance under Alternative D2 would be only 995 acres—even though the Tax Act requires the Secretary to authorize up to 2,000 surface areas of federal land on the Coastal Plain to be covered by production and support facilities. *Compare* Final SEIS at 3-91 *with* Tax Act § 20001(c)(3).

81.     In the Final SEIS, the BLM engages in wishful thinking to downplay the adverse impacts of NSO stipulations on Coastal Plain development. The Final SEIS states that "current horizontal drilling technology would allow operators to recover oil and gas from NSO areas that are within up to six miles of an area where a well pad could be

located." Final SEIS at 3-48. This statement, however, lacks factual support in the Final SEIS or elsewhere. Moreover, the lack of data from well drilling or seismic operations in the Coastal Plain prevents an operator from designing or implementing a program for horizontal development. *See* Exhibit 1, Decl. of Kirk Morgan ¶¶ 8, 10. Even at the initial exploratory phase, an oil and gas exploration company likely would not choose to drill a horizontal well because doing so would not provide necessary geologic information for the exploratory phase. *Id.* ¶ 9.

82.     In fact, the compound effect of surface limitations imposed by the 2024 ROD will prevent efficient use of, and may entirely preclude, development of the Coastal Plain. Notably, even in a best-case scenario under the 2024 ROD's assumptions, a maximum of 400 million barrels of oil will be recovered from the Coastal Plain—just five percent of the total estimated amount of technically recoverable oil on the Coastal Plain. *See* Final SEIS at 3-47 (estimating approximately 7.7 billion barrels of oil could be economically recovered from the Program Area), 3-51 (estimating 0.4 billion barrels of oil would be produced under Alternative D2). But there is good reason to doubt even that amount can feasibly be produced under the 2024 ROD. In the Final SEIS, the BLM recognized that "*these limitations could . . . even prevent development*, if no economically viable oil accumulations were discovered in proximity to locations where [central processing facilities] and drill pads could be located," *id.* at 3-51 (emphasis added), and that "*surface*

*disturbance limits could restrict total development and production*." *Id.* at 3-48 (emphasis added).

83.    In the 2024 ROD, the BLM also affirmed its new legal interpretations of ANILCA and the Tax Act. The BLM concluded that Alternative D2 achieved the proper balance of the Refuge's five statutory purposes in Section 303(2)(B) of ANILCA. 2024 ROD at 9. Specifically, the BLM determined that "Alternative D2 contains lease stipulations and [required operating procedures] to protect resources and balance the uses addressed in the four pre-existing Arctic Refuge purposes while allowing surface occupancy use to support the fifth purpose." *Id.*

84.    In the 2024 ROD, the BLM also purported to "correct the legal deficiency" in the 2020 ROD related to the 2,000-acre provision in Section 20001(c)(3) of the Tax Act. *Id.* at 6. The BLM explained that "the inclusion of the phrase 'up to' in Section 20001(c)(3) plainly indicates that less than 2,000 acres *may be* authorized in appropriate circumstances[.]" *Id.*

**F.    The BLM Proposes to Lease Oil and Gas Resources Consistent with the 2024 ROD.**

85.    On December 10, 2024, the BLM announced a sale of Coastal Plain leases scheduled for January 9, 2025 ("2025 Lease Sale"). 89 Fed. Reg. 99270 (Dec. 10, 2024). The BLM then deferred the sale date until January 10, 2025, in light of the December 30, 2024, Executive Order Providing for the Closing of Executive Departments and Agencies of the Federal Government on January 9, 2025. 90 Fed. Reg. 332 (Jan. 3, 2025). The BLM

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

published a Detailed Statement of Sale ("Sale Notice") that identifies the tracts the BLM is offering for lease, stipulations that attach to the leases, and lease sale procedures.

86.     The Sale Notice proposes that the BLM will offer twelve tracts for lease that collectively cover 400,221 mineral acres. Sale Notice at Exhibit B. Eleven of these tracts appear to have the same boundaries and tract numbers as the tracts that were offered and purchased at the 2021 Lease Sale with one difference—the BLM removed from the tracts the lands that the 2024 ROD closed to leasing. *Compare supra* Figure 2 *with infra.* Figure 4.



**Figure 4 – Coastal Plain 2025 Lease Sale (available tracts)**

87.     The tracts to be offered at the 2025 Lease Sale are subject to the onerous surface limitations set forth in the 2024 ROD.



**Figure 5 – Coastal Plain Lease Sale 2025 (tracts impacted by NSO stipulations)**

## IV.     THE 2024 ROD AND 2025 LEASE SALE WILL SUBSTANTIALLY HARM THE STATE.

88.     The 2024 ROD and 2025 Lease Sale will cause distinct and substantial harms to the State.

89.     Although the Tax Act entitles the State to half of the bonus, royalty, and rentals that the United States receives from Coastal Plain leases, *see* Tax Act § 20001(b)(5), the 2024 ROD and 2025 Lease Sale reduce potential revenue to the State by preventing meaningful leasing, exploration, and development of the Coastal Plain. The 2024 ROD

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

closes nearly two-thirds of the Coastal Plain to oil and gas leasing. Worse, it makes the lands available for lease impossible or impracticable to develop by significantly restricting surface use and occupancy. In essence, the 2024 ROD and 2025 Lease Sale are designed to inhibit and deter, rather than promote, development of the Coastal Plain's mineral resources.

90.     Moreover, because the Secretary cancelled leases sold at the 2021 Lease Sale, the 2024 ROD and 2025 Lease Sale thwart Congress' direction that the Secretary conduct two lease sales and offer 400,000 acres for lease at each sale (800,000 acres in total). Whereas the Congressional Budget Office predicted that Alaska would receive $1.1 billion in lease revenues between 2018 and 2027, the 2024 ROD and 2025 Lease Sale will cause Alaska to receive a small fraction of these potential receipts.

91.     Moreover, the DOI's improper limits on leasing and development in the Coastal Plain will reduce the revenue the State will receive as royalty on any production from the Coastal Plain. Royalty on production is valued at the well-head, meaning that costs associated with the transportation of produced oil to market can be deducted from its value. In Alaska, these costs are based in part on large, relatively fixed costs that are spread across the number of barrels transported down the Trans Alaska Pipeline System (TAPS). As more oil is produced from the Coastal Plain leases and transported down the TAPS, per-barrel transportation costs will decrease and, thus, the amount of royalty revenue the State receives will increase. Moreover, increase production in TAPs will greatly benefit

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

system integrity and extend the operational life of TAPS and North Slope oil fields. The 2024 ROD and 2025 Lease Sale prevent the State from realizing these benefits.

92.     Because of these and other harms, the State now asks this Court to hold unlawful and set aside the Final SEIS, 2024 ROD, and Sale Notice and enjoin the BLM from issuing leases sold at the 2025 Lease Sale.

### <u>COUNT I – VIOLATION OF THE APA AND TAX ACT</u>
**The 2024 ROD and Sale Notice Fail to Offer
the Statutory Minimum Lease Sales and Acreage**

93.     The State hereby incorporates and restates all preceding paragraphs.

94.     A "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

95.     "[A]n administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000).

96.     The 2024 ROD and Sale Notice violate the Tax Act and thus the APA. The Tax Act requires the Secretary to hold a minimum of two Coastal Plain lease sales by December 2024 and offer a minimum of 400,000 acres area-wide for lease at each sale. Tax Act § 20001(c)(1). Thus, the Tax Act requires that the BLM separately offer a minimum of 400,000 acres for lease by December 2024 at two lease sales.

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

97.     In 2021, the BLM offered approximately 1.1 million acres area-wide on the Coastal Plain for lease and sold leases covering approximately 552,800 acres. The BLM then imposed a moratorium on all activities connected with the 2021 Lease Sale and eventually cancelled these leases—nullifying the 2021 Lease Sale.

98.     Putting aside whether those prior actions violated the Tax Act in nullifying the 2021 Lease Sale, even if such actions were lawful, the 2024 ROD and Sale Notice fail to meet the Tax Act's requirements for lease sales. Because the "initial lease sale" effectively never occurred (given the BLM's purported cancellations), the 2024 ROD and Sale Notice do not qualify as a "second lease sale" of an additional and separate 400,000 acres pursuant to Section 20001(c)(1) of the Tax Act.

99.     Thus, the 2024 ROD and Sale Notice violate the Tax Act by failing to satisfy Congress' requirement of a "second lease sale" within seven years of the Tax Act's enactment and the related requirement that at least 800,000 acres be offered for lease by at two separate lease sales (400,000 acres at least in each sale) and thus violate the APA.

## COUNT II – VIOLATION OF THE APA AND TAX ACT
### The 2024 ROD Violates the Tax Act by Closing to Leasing and Development Nearly 1.2 Million Acres of the Coastal Plain

100.    The State hereby incorporates and restates all preceding paragraphs.

101.    A "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §§ 706(2)(A), (C).

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

102.    "[A]n administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000).

103.    The Tax Act provides that "Section 1003 of [ANILCA] shall not apply to the Coastal Plain" and thereby repeals ANILCA's temporary prohibition of oil and gas development on the Coastal Plain. Tax Act § 20001(b)(1).

104.    By closing nearly 1.2 million mineral acres to future leasing, however, the 2024 ROD effectively reinstates ANILCA's prohibition on oil and gas development throughout nearly three-quarters of the Coastal Plain.

105.    The Tax Act requires that the Secretary conduct "not fewer than 2 lease sales area-wide" and, at each, offer for lease at least 400,000 acres "area-wide" on the Coastal Plain. Tax Act § 20001(c)(1)(B)(i)(I). With this direction, Congress intended that the BLM would offer at least a total of 800,000 acres for lease "area-wide"—i.e., throughout—the Coastal Plain.

106.    The 2024 ROD thus violates the Tax Act's requirement that the Secretary offer for lease at least 800,000 acres "area-wide" and violates the APA.

### COUNT III – VIOLATION OF THE APA, ANILCA AND TAX ACT
**The 2024 ROD Violates ANILCA and the Tax Act by Closing to Leasing and Development Nearly 1.2 Million Acres of the Coastal Plain and Deterring Development on the Remaining Lands**

107.    The State hereby incorporates and restates all preceding paragraphs.

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

108.    A "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

109.    ANILCA provides "a proper balance between the reservation of national conservation system units and those public lands necessary and appropriate for more intensive use and disposition." 16 U.S.C. § 3101(d). With ANILCA, Congress attempted, once and for all, to identify which lands would be entered into the conservation system and which lands would be open to multiple use.

110.    Section 1002 of ANILCA provides that the Coastal Plain be open for oil and gas exploration and development. 16 U.S.C. § 3142. After its extensive review, DOI found that oil and gas activity should be permitted within the entire Coastal Plain.

111.    The Tax Act confirms that oil and gas development shall be authorized on the Coastal Plain. Tax Act § 20001(b)(1).

112.    Neither ANILCA nor the Tax Act provide any authority for the BLM to close any portion of the Coastal Plain to oil and gas development. Congress has authorized BLM to reasonably regulate this development, but BLM has no statutory authority to preclude development in its entirety.

113.    By closing a majority of the Coastal Plain to development and deterring development in the remaining portion, the BLM has exceeded its congressional grant, and the issuance of the 2024 ROD is an unlawful and arbitrary action.

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

## COUNT IV – VIOLATION OF THE APA AND TAX ACT
### The Notice of Sale and 2024 ROD Violate the APA and Tax Act by Preventing the Administration of a Program for Leasing and Development of the Coastal Plain

114. The State hereby incorporates and restates all preceding paragraphs.

115. A "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be arbitrary, capricious, . . . or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

116. The arbitrary and capricious standard requires "a rational connection between facts found and conclusions made." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 760 (9th Cir. 2014) (quoting *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011)). "Factual determinations must be supported by substantial evidence." *Id.* at 759 (citing *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999)).

117. The Tax Act directs that "[t]he Secretary shall establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain." Tax Act § 20001(b)(2)(A).

118. The Sale Notice and 2024 ROD violate the Tax Act by effectively preventing the administration "of a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain." Specifically, the Sale Notice and the 2024 ROD subject nearly eighty percent of the area covered by Coastal Plain leases to onerous and unnecessarily burdensome NSO, controlled surface

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

Page 33 of 42

Case 3:25-cv-00003   Document 1   Filed 01/06/25   Page 33 of 42

use, and timing limitation stipulations that may entirely prevent development of Coastal Plain resources, and that fall far short of promoting a "competitive oil and gas program" as required by the Tax Act.

119.    Moreover, the Sale Notice and 2024 ROD thwart the Tax Act's purpose of generating revenue for the United States and State of Alaska. The onerous and unnecessarily burdensome NSO, controlled surface use, and timing limitation stipulations make the leases less desirable to the market and therefore depress the bonuses paid for leases at their initial sale. These stipulations will also limit the amount of oil that will be produced from the Coastal Plain and, correspondingly, the State's share of royalty from the sale of this production.

120.    Furthermore, the NSO stipulations are arbitrary and capricious because they are premised on the BLM's unsupported conclusion that "current horizontal drilling technology would allow operators to recover oil and gas from NSO areas that are within up to six miles of an area where a well pad could be located." Final SEIS at 3-48.

## COUNT V – VIOLATION OF THE APA AND TAX ACT
### The 2024 ROD and Final SEIS Erroneously Interpret
### the 2,000-Acre Provision in Section 20001(c)(3) of the Tax Act

121.    The State hereby incorporates and restates all preceding paragraphs.

122.    A "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be arbitrary, capricious, . . . or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

123.     In Section 20001(c) of the Tax Act, Congress directed that the Secretary "shall issue any rights-of-way or easements across the Coastal Plain . . . necessary to carry out this section," Tax Act § 20001(c)(2), and "shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities[.]" *Id.* § 20001(c)(3).

124.     The 2024 ROD erroneously interprets Section 20001(c)(3) of the Tax Act to allow the BLM to authorize less than 2,000 acres "in appropriate circumstances, such as for alternatives that make large areas unavailable for leasing or surface development and thus may require fewer production and support facilities." 2024 ROD at 6, 9. This interpretation is inconsistent with and thus violates the Tax Act. Pursuant to Congress' directive, the BLM must not deny or unreasonably limit development of production and support facilities to the Coastal Plain until 2,000 surface acres are covered by production and support facilities.

125.     Additionally, the Final SEIS adopts an erroneously rigid interpretation of Section 20001(c)(3) of the Tax Act, finding that "[o]nce 2,000 acres of disturbance are reached, no additional disturbance would be allowed, regardless of reclamation of previously disturbed areas." Final SEIS at 1-9 to 1-10. The Tax Act does not demand this interpretation. Rather, the Tax Act allows that, when federal land formerly containing production and support facilities is reclaimed, additional acreage may be subject to the 2,000-acre limit.

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

126.     The Final SEIS' interpretation of Section 20001(c)(3) of the Tax Act also improperly infringes on the BLM's obligations under Section 20001(c)(2) of the Tax Act. Section 20001(c)(2) directs that "[t]he Secretary shall issue any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out" the Tax Act. The Final SEIS improperly interprets roads or off-lease pipelines authorized by a right-of-way as counting toward the 2,000-acre limit in Section 20001(c)(3). Final SEIS at 1-10. Subjecting rights-of-way and easements issued pursuant to Section 20001(c)(2) to the 2,000-acre limit in Section 20001(c)(3) frustrates necessary access to federal land on the Coastal Plain to promote oil and gas exploration and development activities. Accordingly, rights-of-way and easements issued pursuant to Section 20001(c)(2) are not subject to the 2,000-acre limit in Section 20001(c)(3).

127.     Because the 2024 ROD and Final SEIS erroneously interpret Section 20001(c)(3) of the Tax Act, the 2024 ROD and Final SEIS are "not in accordance with law" and must be set aside.

### COUNT VI – VIOLATION OF THE APA AND TAX ACT
**The 2024 ROD Improperly Limits Seismic Exploration on the Coastal Plain**

128.     The State hereby incorporates and restates all preceding paragraphs.

129.     A "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be arbitrary, capricious, . . . or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

130.    The arbitrary and capricious standard requires "a rational connection between facts found and conclusions made." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 760 (9th Cir. 2014) (quoting *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011)). "Factual determinations must be supported by substantial evidence." *Id.* at 759 (citing *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999)).

131.    The Tax Act directs that "the Secretary shall manage the oil and gas program on the Coastal Plain in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. 6501 et seq.) (including regulations)." Tax Act § 20001(b)(3).

132.    In the Naval Petroleum Reserves Production Act of 1976, Congress authorized exploration throughout the entire National Petroleum Reserve in Alaska, including in areas with significant subsistence, recreational, fish and wildlife, or historical, or scenic value, as long as such exploration is conducted in a way that "assure[s] the maximum protection of such surface values to the extent consistent with the requirements of [the Naval Petroleum Reserves Production Act] for the exploration of the reserve." 42 U.S.C. § 6504(a).

133.    The 2024 ROD limits a primary form of exploration—seismic activity—to the 400,000-acre portion of the Coastal Plain available for leasing. 2024 ROD at 12-13. This limitation is inconsistent with the Naval Petroleum Reserves Production Act of 1976,

which does not categorically preclude exploration in any area and instead allows exploration consistent with protection of surface values and other requirements of relevant law.

134.    Further, by limiting seismic activity to 400,000 acres of the Coastal Plain, the 2024 ROD unreasonably prevents the United States and the public from obtaining much-needed seismic exploration that will inform future management of the Coastal Plain, including by helping determine the areas of greatest potential for oil and gas development.

135.    Therefore, the provision in the 2024 ROD limiting seismic activity to leased areas violates the Tax Act and is arbitrary and capricious.

### <u>COUNT VII – VIOLATION OF NEPA AND THE APA</u>
### The BLM Was Required to Prepare a Supplemental Draft SEIS

136.    The State hereby incorporates and restates all preceding paragraphs.

137.    A "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be arbitrary, capricious, . . . or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

138.    An agency must prepare a supplement to a draft EIS when "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns." 40 C.F.R. § 1502.9(d)(1)(i).

139.    When applying this regulation, the Ninth Circuit has found that an agency must supplement its draft EIS when a new alternative is more than a "*minor variation* of one of the alternatives discussed in the draft EIS" and the new alternative is not

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

"*qualitatively within the spectrum of alternatives* that were discussed in the draft [EIS]."

*See Great Old Broads for Wilderness v. Kimball*, 709 F.3d 836 (9th Cir. 2013) (quoting

*Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1044 (9th Cir. 2011)).

140.    The Final SEIS introduced Alternative D2, which proposed to close

approximately 1,163,500 million acres of the Coastal Plain to leasing. Final SEIS at 2-2

tbl.2-1. This proposed closure of more than 1.1 million acres dwarfed the number of acres

proposed for closure under Alternatives B – D described in the Draft SEIS. Draft SEIS at

2-2 tbl.2-1. Thus, Alternative D2 is more than a "minor variation" on, and not "qualitatively

within the spectrum of[,]" the alternatives in the Draft SEIS. Therefore, the BLM was

required to prepare a supplemental Draft SEIS.

141.    The BLM's failure to prepare a supplemental Draft SEIS deprived both

cooperators, including the State and the general public, of the opportunity to consider and

comment on the new Alternative D2, and prevented the BLM from having the benefit of

such comments before issuing a ROD.

142.    The BLM's failure to prepare a supplemental Draft SEIS thus violated

NEPA.

### COUNT VIII – VIOLATION OF NEPA AND THE APA
### The Final SEIS's Purpose and Need and the 2024 ROD
### Exceed the BLM's Statutory Authority

143.    The State hereby incorporates and restates all preceding paragraphs.

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

144.   A "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be arbitrary, capricious, . . . or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

145.   An EIS must "include a statement that briefly summarizes the underlying purpose and need for the proposed agency action." 40 C.F.R. § 1502.13. The purpose and need statement "dictates the range of 'reasonable' alternatives." *City of Carmel-by-the-Sea v. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). "The existence of reasonable but unexamined alternatives renders an EIS inadequate." *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998).

146.   "Where an action is taken pursuant to a specific statute, the statutory objectives of the project serve as a guide by which to determine the reasonableness of objectives outlined in an EIS." *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 866 (9th Cir. 2004) (citing *City of New York v. U.S. Dep't of Transp.*, 715 F.2d 732, 743 (2d Cir. 1983)). "[T]he considerations made relevant by the substantive statute driving the proposed action must be addressed in NEPA analysis." *Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1109 (9th Cir. 2010).

147.   The purpose and need statement in the Final SEIS, which directs that alternatives must consider "all five" purposes of the Refuge, "none of which are superseded by any other," Final SEIS at 1-3, is inconsistent with the Tax Act. By putting the Refuge's five purposes "on equal footing" with one another, this purpose and need statement

effectively subjects development within the Coastal Plain to the Refuge's four other purposes. The Tax Act contains no such directive. Accordingly, the Final SEIS' purpose and need statement is unreasonable and violates NEPA.

148.    Because the Final SEIS analyzes alternatives that are bounded by the deficient purpose and need statement, the Final SEIS fails to analyze a reasonable range of alternatives and thus violates NEPA.

149.    The 2024 ROD similarly violates NEPA. First, the 2024 ROD adopts Alternative D2, which is predicated on the deficient purpose and need statement. Second, the 2024 ROD explicitly adopts and endorses the erroneous interpretation of the Tax Act that places all five purposes of the Refuge on equal footing with another.

## PRAYER FOR RELIEF

WHEREFORE, State requests the Court order the following relief:

(a)    A declaratory judgment holding that the Final SEIS, 2024 ROD, and Sale Notice violate the Tax Act and are arbitrary and capricious;

(b)    A declaratory judgment holding that the Final SEIS, 2024 ROD, and Sale Notice violate NEPA and are arbitrary and capricious;

(c)    A decision holding unlawful and setting aside the Final SEIS, 2024 ROD, and Sale Notice; and

(d)    A temporary and/or permanent injunction prohibiting Defendants from issuing oil and gas leases sold at the 2025 Lease Sale.

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003

Dated: January 6, 2025

Respectfully submitted,


By: */s/ Kathleen C. Schroder*

TREG TAYLOR
ATTORNEY GENERAL

Ronald W. Opsahl (Bar No. 2108081)
Assistant Attorney General
Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Fax: (907) 276-3697
Email:    ron.opsahl@alaska.gov

Kathleen C. Schroder (*pro hac vice* pending)
Mark Champoux (*pro hac vice* pending)
Davis Graham & Stubbs LLP
3400 Walnut St., Suite 700
Denver, CO 80205
Telephone: (303) 892-9400
Fax: (303) 893-1379
Email:    katie.schroder@davisgraham.com
mark.champoux@davisgraham.com

*Attorneys for the State of Alaska*

Complaint,
*State of Alaska v. U.S. Dep't of the Interior et al.*, No. 3:25-cv-00003